Malcolm J. Morison, Jr., and Annie Laura Morison v. Commissioner.
Morison v. Commissioner
Docket No. 63445.
United States Tax Court
T.C. Memo 1960-243; 1960 Tax Ct. Memo LEXIS 48; 19 T.C.M. (CCH) 1364; T.C.M. (RIA) 60243; November 17, 1960
*48 1. Held, that shares of stock issued to the principal petitioner by a corporation of which he was the president and general manager constituted compensation for services rendered and excess reimbursement for travel expenses, and therefore were taxable income to him. Held, further, that the fair market value of said shares is determined. 2. Held, that the principal petitioner is not entitled to deduct premiums paid by him on a policy of term insurance on his life, which was taken out in order to meet a requirement imposed by a creditor upon petitioner's controlled corporation, as to which said creditor was the beneficiary, and of which the proceeds were to be used to pay off the corporation's debt to said creditor. George D. Webster, Esq., 1144 Pennsylvania Building, Washington 4, D.C., for the petitioners. George L. Hudspeth, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in the income taxes of the petitioners for each of the calendar years 1952 and 1953, in the respective amounts of $2,378.03 and $337.38. The issues presented for decision are: (1) Whether petitioner Malcolm J. Morison, Jr., realized *49 income in 1952, as the result of transactions between him and his controlled corporation wherein: (1) The corporation issued petitioner two checks totaling $7,700 (one in the amount of $5,200 for accrued salary, and the other in the amount of $2,500 for reimbursement of traveling expenses); (2) petitioner simultaneously issued his personal checks to the corporation in amounts identical to those issued to him by the corporation; and (3) the corporation issued to the petitioner 77 shares of its $100 par value stock. If it is decided herein that petitioner realized income represented by the stock, it will be necessary to determine the fair market value of the stock which he received. (2) Whether petitioner Malcolm J. Morison, Jr., is entitled to a deduction for each of the taxable years involved, for a premium paid on a policy of term insurance on his life which was taken out in order to meet a requirement imposed by a creditor upon petitioner's controlled corporation, and whereunder said creditor was made the beneficiary. Numerous other issues raised by the pleadings were conceded by the parties, either by written stipulation, orally at the trial, or on brief. These concessions will *50 be taken into consideration in computations under Rule 50. Findings of Fact Some of the facts were stipulated The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioners, Malcolm J. Morison, Jr., and Annie Laura Morison, are husband and wife; and they reside in Kingsport, Tennessee. For each of the taxable calendar years involved, they filed a joint income tax return on the cash receipts and disbursements method of accounting, with the director of internal revenue for the district of Tennessee. Malcolm Morison will be referred to hereinafter as the petitioner. Petitioner, prior to the spring of 1952, was employed in an executive capacity with the Tennessee Eastman Company at Kingsport. On January 21, 1952, he organized a corporation named Metals, Inc. (hereinafter called "the corporation"), under the laws of the State of Tennessee, with an authorized capital of $100,000, divided into 1,000 shares having a par value of $100 each, and with its principal place of business at Bristol, Tennessee. On February 28, 1952, the corporation issued and had outstanding 50 shares of its common stock at par, as follows: No. of
Stockholder
Shares
Par value
W. B. Wiggins
11-5/8
$1,162.50
G. F. Dugger
1-2/8
125.00
M. J. Morison, Jr. (peti-
tioner)
25-4/8
2,550.00
Carmage Walls
11-5/8
1,162.50
Total
50
$5,000.00
*51 The corporation began active operations in April 1952. Petitioner was elected president of the corporation; and, after resigning his position with Tennessee Eastman in April 1952, he served at all times material thereafter as president and acted as the general manager of the corporation, at a salary of $12,500 per year. The business of the corporation was primarily that of serving as a warehouse for the storage of metals, such as stainless steel, copper and aluminum; and it also served as a manufacturer's representative in the area in and around Bristol and Kingsport, Tennessee, for the major producers of metal. Almost immediately after the corporation began the active conduct of its business, it encountered financial difficulties. Stockholders Wiggins and Walls, upon whom petitioner was relying to supply a large part of the financing for the corporation, declined in May 1952, to invest any more funds in the corporation; and at that time, they sought unsuccessfully to sell their shares at one-half of the par value which they had paid therefor. At or shortly after the time when Wiggins and Walls declined to invest additional funds, the corporation was heavily in debt and in need of *52 working capital. Petitioner thereupon sought to raise working capital for the corporation by issuance of additional shares of its stock; but, despite efforts that continued from May to September 1952 to attract both local and out-of-town capital, he was unable to sell any of said corporation's stock, for the reasons that he was the only person connected with the corporation who knew the metals business, that the corporation was undercapitalized, and that its stock had theretofore been offered for sale at a 50 per cent discount by Wiggins and Walls. During said period of May to September 1952, the only way that the corporation was able to obtain working capital funds, was through borrowings from Bristol banks; and this was possible only because petitioner and his father endorsed the corporation's notes. In June 1952, while petitioner was trying to raise capital in the manner above described, he, acting on behalf of the corporation, made application to the Reconstruction Finance Corporation (hereinafter called the "RFC") for a loan of funds which would supply needed working capital. During the course of preliminary negotiations, the RFC advised that a loan would be made, only after the *53 following requirements, among others, had been met: (1) The corporation would have to have at least $30,000 of paid-in capital; (2) it would have to liquidate all its outstanding unsecured obligations; and (3) a term life insurance policy in the amount of the loan would have to be taken out on petitioner's life, with the RFC as the beneficiary. In September and October 1952, the following steps were taken, pursuant to the advice and recommendation of a representative of the RFC, to meet the above-listed requirements: (1) On September 20, 1952, petitioner himself paid in $12,000 to the corporation, and he prevailed upon his father to invest $5,000. They were issued certificates for 120 and 50 shares, respectively, of stock in the corporation. The funds so invested were used to pay off a note of the corporation at a Bristol bank, on which said two individuals were endorses. (2) On September 24, 1952, the corporation had on its books of account accrued liabilities of $5,200 for salary to petitioner as president, and of $800 to George J. Dugger for legal services rendered to the corporation. On said date, pursuant to a prearranged plan, the corporation issued its checks to petitioner and *54 Dugger in the respective amounts of $5,200 and $800, and made accounting entries debiting the accrued liabilities and crediting cash. Simultaneously, petitioner and Dugger issued their checks in the respective amounts of $5,200 and $800 to the corporation, and the corporation thereupon issued 52 shares of its stock to petitioner and 8 shares to Dugger. (3) On October 6, 1952, the corporation had on its books of account an accrued liability to petitioner of at least $2,500 representing unreimbursed travel expenses incurred and paid by petitioner in the performance of his duties as president of the corporation. On said date, pursuant to a prearranged plan, the corporation issued its check for $2,500 to petitioner, and debited the accrued liability and credited cash. Simultaneously, petitioner issued his check to the corporation in the identical amount of $2,500, and he was issued a certificate for 25 shares of the corporation's stock. (4) The Security Life and Trust Company of Winston Salem, North Carolina, an insurance company, issued a policy of term life insurance in the amount of $35,000 on the life of petitioner, where-under the RFC was the beneficiary. The policy contained provisions *55 that the amount thereof was subject to reduction at the end of each year, if and to the extent that the principal amount of the corporation's loan had been paid. The checks issued by petitioner and the corporation in the above-described transactions of September 24 and October 6, were deposited in the bank accounts of the respective payees, and were duly paid by the drawee banks. Neither petitioner nor the corporation had sufficient funds on deposit at the time when each drew his or its checks, to cover said checks; and it was necessary for the petitioner to have the corporation's checks to deposit before the checks issued by him would be paid, and for the corporation to have petitioner's checks before its checks would be paid. With regard to the above-mentioned insurance policy, the agreement between petitioner and the corporation was that the corporation should pay the premiums on said policy. However, the corporation had insufficient funds to pay such premiums; and it was necessary for petitioner to do so. Petitioner did pay the premiums for the years 1952 and 1953, in the respective amounts of $707.55 and $943.40. Following the above-described transactions, the requirement imposed *56 by the RFC had been met, and that agency thereupon approved the corporation's application for a loan in the amount of $35,000. The proceeds of the loan were actually made available to the corporation in December 1952. The corporation, in its 1952 Federal income tax return, included in the deductions claimed thereon for salary paid to the petitioner, the above-mentioned amount of $5,200; and the corporation also included in the deductions claimed on said return for travel expenses, the above-mentioned sum of $2,500. Petitioner, in his income tax return for the year 1952, treated the 52 shares and 25 shares of the corporation's stock issued to him on September 24 and October 6, 1952, respectively, as having been "awarded [him] in lieu of salary and in payment of nonreimbursed travel"; and he included in the gross income reported therein, the sum of $3,850, representing one-half of the par value of said 77 shares. Also, in his 1952 return, petitioner claimed a deduction of $707.55 for premiums paid on the above-mentioned term life insurance policy. Petitioner did not, on his 1953 return, claim a deduction for the $943.40 of premiums which he paid with respect to such policy in 1953; but *57 in an amended petition filed herein, he alleges that a deduction in said amount should have been allowed for said latter year. The respondent, in his notice of deficiency herein, determined that petitioner had received salary from the corporation during 1952 in the total amount of $9,100, composed of $3,900 (received in cash, and regarding which there is no dispute) and the above-described $5,200 check dated September 24, 1952, from the corporation to petitioner; and that petitioner had received $5,265.94 as travel reimbursement from the corporation, which sum included the above-described $2,500 check dated October 6, 1952. [1] The respondent also disallowed the deduction claimed on the petitioner's 1952 return for the premiums paid on the term life insurance policy. And, in respondent's answer to the abovementioned amended petition, he denied that petitioner was entitled to a deduction for the premiums paid on said policy for 1953. Opinion 1. The first issue is whether petitioner realized taxable income as the result of those transactions which he had *58 with his controlled corporation on September 24 and October 6, 1952 - which transactions have been described in our Findings of Fact. Briefly stated, the position of the respondent with respect to this issue is, that the two checks totaling $7,700 constituted income to petitioner - to the extent of $5,200 as compensation for services rendered, and to the extent of $2,500 as excess reimbursements for travel expenses. Respondent argues in support of such contention that, in separate and unrelated transactions, petitioner purchased 77 shares of the corporation's stock, using as the purchase price therefor, the same $7,700 which the respondent claims the corporation paid him. In the alternative, respondent contends that the 77 shares of stock constituted income to the petitioner, and that the fair market value of those shares was not less than the par value thereof, or $100 per share ($7,700). Petitioner, on the other hand, contends that the $7,700 represented by the abovementioned checks did not constitute income, for the reason that the issuance of the checks to him by the corporation, was but an integrated step in a single transaction wherein petitioner and his controlled corporation *59 exchanged checks - such exchange being effected upon the advice and at the suggestion of a representative of the RFC, as a means of meeting one of that agency's requirements for approving a loan to the corporation. Petitioner further contends that, insofar as the 77 shares of stock are concerned, they did not constitute income to him, for the reason that they were issued as a nontaxable stock dividend; and, that even if such shares did constitute taxable income, their receipt by petitioner would have no effect tax-wise, inasmuch as (so petitioner contends) they had no fair market value when received. We can not agree entirely with either party. In our opinion, the 77 shares of stock (and not the $7,700 in checks) constituted taxable income to the petitioner; and such shares had a fair market value of $50 per share (not zero per share, as contended by petitioner; nor $100 per share, as contended by respondent) when received by petitioner. The Internal Revenue Code of 1939, which applies to the taxable year here involved, provides in section 22(a) that there shall be included in gross income "gains, profits, and income derived from salaries, wages, or compensation for personal services *60 * * * of whatever kind and in whatever form paid * * *." Several cases have held that transactions which appeared on the surface to be the payment of compensation for services, did not give rise to taxable income to the payees. For example, in Commissioner v. Smucker, (C.A. 6) 170 F. 2d 147, affirming per curiam a Memorandum Opinion of this Court, the Court of Appeals for the Sixth Circuit affirmed this Court's holding that where bonuses were paid to the officers of a close corporation, but there was an agreement that such bonuses would be reinvested by the officers in the corporation in order to provide funds for an expansion program, the amount of such bonuses was not includible in the income of said officers. And, in Deloss E. Daggitt, 23 T.C. 31, acquiesced in by the Commissioner, 1955-1 C.B. 4, we held that stock distributed to two stockholders substantially in proportion to their prior stock ownership, purportedly in payment of salary, did not constitute taxable income, citing and relying upon Eisner v. Macomber, 252 U.S. 189. The respondent himself has ruled that, where an employee had been given checks for the full amount of his agreed salary, but prior to the receipt *61 of such salary checks he issued his personal checks to his employer for the amount of a decrease in his salary which was consented to because of the weakened financial condition of the employer, said employee would be regarded as having received only the amount of the reduced salary and not the full amount of the checks. See I.T. 2743, XII-2, C.B. 103. In the light of the foregoing authorities, we think it is necessary to examine carefully the facts and circumstances surrounding the transactions of September 24 and October 6, to determine the true intent of the parties with respect thereto, keeping in mind the oft-voiced admonition that, in tax matters, substance rather than form is controlling. See Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. (C.A. 7) 254 F. 2d 51. Those facts and circumstances may be recapitulated very briefly. The corporation, in dire need of working capital, had pending before the RFC an application for a loan. The RFC had laid down as requirements for the granting of the loan, that the corporation would have to first raise its paid-in capital to $30,000 and liquidate its unsecured liabilities. By September 24, 1952, the paid-in capital had been raised to $22,000 *62 and much of the unsecured liabilities had been liquidated. On that date there still remained $8,000 of paid-in capital to be raised; and, also on said date, there were outstanding unsecured liabilities of at least $8,500: (1) $5,200 to petitioner for accrued salary; (2) $2,500 to petitioner for unreimbursed travel expenses; and (3) $800 to an attorney for accrued fees for professional services. A representative of the RFC advised and suggested a plan to wipe out the liabilities and increase the paid-in capital: The corporation was to issue its checks in ostensible payment of the liabilities; the recipients of the checks were simultaneously to issue their checks to the corporation in identical amounts, and be issued stock therefor. The plan so conceived was executed, in part on September 24 and in part on October 6, 1952. It is to be noted that neither the checks of the petitioner, nor those of the corporation were "good" when issued; each party had to have the checks of the other party to deposit before the checks drawn by each would be honored by the drawee banks. The corporation thereafter included in expense deductions on its return, $5,200 for salary and $2,500 for travel; and, *63 for his part, petitioner on his return stated that the stock had been "awarded * * * in lieu of salary," and he placed thereon a value of $50 per share. To us it seems inescapable from the foregoing facts and circumstances that the corporation did not intend to pay petitioner his accrued salary and his unreimbursed travel expenses, when it issued the checks of September 24 and October 6 to him. We hold, accordingly, that those checks did not constitute taxable income to the petitioner. We do believe, however, that the intent of the parties, and the legal effect of their actions in implementation of that intent, was to compensate and reimburse petitioner, through the medium of issuance to him of common capital stock of the corporation. The corporation wiped out its liabilities to petitioner and deducted amounts equal to the par value of its stock issued to him in the above-described transactions; and petitioner himself treated the stock as income on his return. Petitioner's contention that the stock distributed to him, constituted a nontaxable stock dividend is without merit. It is of the very essence of a stock dividend that the proportionate interests of the shareholders in a corporation *64 must be the same after the distribution of stock to them, as they were before. Eisner v. Macomber, supra.In the instant case, petitioner's father held 50 shares, and stockholders Wiggins and Walls held 11 5/8 shares each; but none of these parties received any additional stock. The result was that petitioner's proportionate interest in the corporation increased. We can not regard such failure to maintain proportionate interests among the stockholders as having no significance. Cf. Deloss E. Daggitt, supra. Having held that the 77 shares of stock were income to the petitioner, we must determine the fair market value of the same. Regs. 118, sec. 39.22(a)-3. As pointed out above in connection with our statements of the contentions of the parties, they are poles apart on this question. The respondent predicates his contention that the fair market value of the stock was the same as the par value thereof (i.e., $100 per share), principally upon two grounds: (1) The sales, at par, by the corporation to the petitioner and to his father of 120 and 50 shares, respectively, on September 20, 1952; and (2) the provisions of section 48-204 of the Tennessee Code Annotated (1955), which are, *65 in material part, as follows: Shares of stock, other than shares without nominal or par value, except shares issued as a stock dividend, may be issued only for such consideration having a value, in the judgment of the * * * board of directors * * * at least equivalent to the full par value of the stock to be issued; * * * As regards the first of respondent's grounds, it is beyond question, that where sales of stock at or near the same time as the date on which such stock is to be valued are relied upon to establish value, they must be arm's length transactions, between a willing seller under no compulsion to sell, and a willing buyer under no compulsion to purchase. The September 20 sales transactions between the corporation and petitioner and his father do not meet these requirements. Petitioner was under a compulsion to invest money in his financially weakened corporation, if it was to survive. He was in no position to haggle and dicker over the price to be paid for the stock. The sales to petitioner's father were likewise under pressure. We are satisfied that the father purchased only upon the importunities of his son, and in an effort to save the corporation which said son controlled. *66 And, as regards the effect of the Tennessee statute above quoted, we believe that it was designed to protect creditors and investors against "watered stock." It is concerned with the value of the consideration given to the corporation for its stock and not with the fair market value of the stock which the corporation issues. In our opinion, said statute has no bearing on the determination of fair market value of the stock in the instant case. Nor can we agree with petitioner that the stock was entirely worthless. That contention is predicated principally on petitioner's testimony that he was unable to find an investor for additional shares of the corporation's stock (presumably at par) from May to September 1952. However, we believe that two new factors came into the picture, which undercut the probative value of petitioner's unsuccessful attempts to find new investors. The first factor is the impending granting of the R.F.C. loan, whereby the corporation was to gain additional working capital. The negotiations for this loan had begun in June 1952; the R.F.C. representative had suggested steps to be taken as a prerequisite to the granting of the loan - which steps were taken on the *67 valuation dates here considered; and, on October 8, 1952 (2 days after the second valuation date), the R.F.C. approved the loan. The second factor is the additional investment of $17,000 by petitioner and his father on September 20, which increased the corporation's paid-in capital and enabled it to reduce its liabilities considerably. These factors, in our opinion, had the effect of making the shares more attractive on each of the valuation dates here involved. Also, referring to the familiar definition for "fair market value" (see Estate Tax Reg. sec. 20.2031-1(b)), we believe that "a willing buyer and a willing seller, * * * both having reasonable knowledge of relevant facts" would have been aware of each of the abovementioned factors, and would have taken them into consideration in determining the price at which they would trade. *
We accept the valuation which the petitioner himself adopted in the written statement attached to his 1952 return 1a - i.e., $50 per share. We hold that the shares of stock received by petitioner *68 had a fair market value of $50 per share when petitioner received them. * 2. The second issue is whether petitioner is entitled to deductions for premiums paid on the policy of term life insurance, described in our Findings of Fact. The findings make it clear that the policy was taken out, solely in order to meet one of the RFC's requirements for approval of the corporation's application for a loan. It thus seems to us, that the premiums on such policy were an expense of the corporation, [2] and not of the petitioner. Indeed petitioner testified that *69 the corporation was supposed to pay these premiums, but that it was unable to do so, owing to lack of funds. Nor can the premiums be regarded as expenses of petitioner's trade or business of being the president and general manager of the corporation. Petitioner argues that, if we should hold that he is not entitled to deduct such premiums as expenses, he should be allowed to offset them against the salary which he received from the corporation. To sanction this treatment of the premiums *70 would be equivalent to permitting that to be done by indirection, which can not be done directly. We are unwilling to approve such treatment. We hold for the respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. The parties have stipulated that the travel expenses actually incurred and paid by petitioner in 1952 were in the amount of $3,025.39.↩
*. The last paragraph on page 1369 was deleted, and two new paragraphs and Footnote 1a inserted, per court order signed by Judge Pierce, dated December 23, 1960.↩
1a. In said statement, petitioner listed his receipts from Metals, Inc., and the taxable portion thereof, in substance, as follows: ↩
Amounts received: $ 3,700.00 for salary, in cash
2,600.00 for salary, represented by $5,200 par value of stock
included by petitioner "at 50% of value"
2,515.44 for travel expense, in cash
1,250.00 for travel expense, represented by $2,500 par value
of stock included "at 50% of value"
Total receipts
$10,065.44
Less
5,710.89 representing an offset for expenses which petitioner
stated "I have not yet charged * * * to the
corporation."
Balance
$ 4,354.55 being the amount included in income by petitioner,
on page 1 of his return.
2. The provisions of section 24(a)(4) of the 1939 Code would apparently preclude the deduction of the premiums by the corporation. That section provides that no deduction shall be allowed with respect to "premiums paid on any life insurance policy covering the life of any officer or employee * * * when the taxpayer is directly or indirectly a beneficiary under such policy." If the petitioner had died, the proceeds of the policy would have been used to pay off the then outstanding balance of the corporation's loan from the RFC. We believe that the corporation must accordingly be regarded as indirectly a beneficiary of the policy. Therefore, it would be barred from claiming a deduction for the premiums.↩